Eugene Killian, Jr.
Virginia Nairooz
THE KILLIAN FIRM, P.C.
Tindall Executive Office Suites
107 Tindall Road
Middletown, NJ  07748
732-912-2100
ekillian@tkfpc.com
vnairooz@tkfpc.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE DIOCESE OF TRENTON,<br><br>*Plaintiff,*<br><br>v.<br><br>CENTURY INDEMNITY CO., AS SUCCESSOR TO CCI INSURANCE CO., AS SUCCESSOR TO INSURANCE CO. OF NORTH AMERICA; FIRST STATE INSURANCE COMPANY; ST. PAUL FIRE AND MARINE INSURANCE COMPANY; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>*Defendants.* | Civil Action No.  3:25-cv-01092<br><br><br>**AMENDED COMPLAINT AND JURY DEMAND, WITH CLAIM FOR DECLARATORY RELIEF** |

Plaintiff, The Diocese of Trenton (the "Diocese"), a non-profit New Jersey corporation having its principal place of business at 701 Lawrenceville Rd, Lawrence Township, NJ 08648, for its Amended Complaint against Defendants First State Insurance Company, St. Paul Fire and Marine

Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA (collectively the "Defendant Insurance Companies"), alleges as follows:[1]

## I.      Nature of this Action

1.    This is a suit for declaratory relief and breach of contract as the result of the Defendant Insurance Companies' failure and refusal to structure and agree upon a suitable allocation and cost-sharing formula to deal with an onslaught of underlying claims brought against the Diocese under the New Jersey Child Victims Act ("CVA"), N.J.S.A. § 2A:14-2a, most of which involve incidents that allegedly happened decades ago.

2.    All of the Defendant Insurance Companies sold policies of liability insurance to the Diocese that were in place when some or all of the underlying incidents allegedly happened.

3.    The CVA, enacted in 2019, extends the statute of limitations for civil claims related to alleged sexual abuse, allowing victims more time to file lawsuits. Specifically, the CVA did the following:

  a.    Extended the statute of limitations for child sexual abuse victims to file civil claims until the alleged victim turns 55 years old, or 7 years after discovering the abuse, whichever is later.

  b.    Opened a two-year revival window (as of December 1, 2019) for victims to file claims that were previously barred by earlier statutes of limitations.

4.    Following many months of negotiation between the Diocese and the Defendant Insurance Companies, the parties have not finalized an allocation or cost-sharing

---

[1] Defendant Century Indemnity Co., as Successor to CCI Insurance Co., as Successor to Insurance Co. of North America, has settled with the Diocese on confidential terms and has been dismissed from this case without prejudice.

agreement with respect to the defense of the underlying claims and fair compensation to victims. In addition, disagreements have arisen as to whether certain self-insured retentions have been exhausted in insurance policies sold to the Diocese, and also as to the proper interpretation of the trigger of coverage under the insurance policies, as well as the interpretation of other policy terms and conditions. Meanwhile the underlying litigation remains ongoing, substantial defense costs continue to accrue, and settlement discussions with certain underlying claimants are difficult or impossible to conclude due to uncertainty as to the participation of the Defendant Insurance Companies.

5.   Proper insurance claim handling involves both an understanding of applicable law and a review of the relevant facts and insurance policy language.

6.   Under well-settled New Jersey law, "[i]nsurers whose policies are triggered by an injury during a policy period must respond to any claims presented to them and, if they deny full coverage, must initiate proceedings to determine the portion allocable for defense and indemnity costs." *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 479 (1994).

7.   The Defendant Insurance Companies' failure to structure an appropriate allocation formula constitutes a violation of New Jersey's Unfair Claim Settlement Practices Act ("UCSPA"), N.J.S.A. §17:29B-4(9) *et seq.,* which makes it unlawful for insurance companies to engage in the following practices, among others:

   a.   Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies, N.J.S.A. §17:29B-4(9)(b).

   b.   Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. N.J.S.A. §17:29B-4(9)(f).

      c.   Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement, N.J.S.A. §17:29B-4(9)(n).

8.    UCSPA ""declare[s] state policy" *Pickett v. Lloyd's*, 131 N.J. 457, 468 (1993).

## II.    <u>The Parties</u>

9.    The Diocese is a religious not-for-profit corporation and Catholic diocese duly organized and existing under the laws of the State of New Jersey, with a principal place of business at 701 Lawrenceville Road, Lawrenceville Township, New Jersey 08648.  The Diocese was established in 1881 by the Holy See of the Roman Catholic Church to serve Catholics in certain New Jersey counties.

10.    Initially, the Diocese included 14 New Jersey Counties and covered two-thirds of the area of New Jersey.

11.    In 1937, Pope Pius XI created the Diocese of Camden to serve Catholics in the six Counties in the southern part of the state. The Diocese of Trenton was reduced to cover eight counties.

12.    In 1981, the Diocese of Metuchen was carved out of the Diocese of Trenton. The Diocese of Metuchen took over the Counties of Middlesex, Somerset, Hunterdon, and Warren.

13.    The Diocese currently includes four New Jersey counties: Burlington, Mercer, Monmouth, and Ocean. The Diocese operates and controls certain parishes, elementary schools, and high schools in those Counties, providing religious and spiritual education, support, and counseling, and charitable services to the community.

14. Defendant First State Insurance Company ("First State") is a Connecticut corporation with its principal place of business in Massachusetts.

15. Upon information and belief, in December 1992, First State ceased writing new and renewal property and casualty business and was placed into runoff. Since then, a group of entities managing First State has focused on the proper disposition of claims, resolving disputes, and collecting reinsurance proceeds related to the business underwritten and reinsured prior to year-end 1992.

16. Upon information and belief, all existing First State business is managed in runoff under a contract between a group of certain entities, plus Hartford Fire Insurance Company, and Horizon Management Group, LLC (Horizon Management), a member company of the Hartford Financial Services Group Inc.

17. First State has substantial experience with insurance coverage for alleged sexual abuse claims. In its 2023 Financial Statement, for example, First State made the following public representations:

On February 14, 2022, The Hartford executed a Final Settlement Agreement (the 'Settlement') with the Boy Scouts of America ('BSA'), and the attorneys representing a majority of the alleged victims, pursuant to which The Hartford agreed to pay $787 million (of which $37.9 million was allocated to First State Insurance Companies' policies) for sexual molestation and sexual abuse claims associated with liability policies issued by various Hartford Writing Companies in the 1970s and early 1980s. In exchange for its payment, the Company receives a complete release of its policies issued to BSA and the Local Councils, as well as an injunction against further abuse claims involving BSA. All conditions precedent to the Settlement have been satisfied, including approval by the bankruptcy court and the district court, and on April 20, 2023, The Hartford paid the Settlement amount of $787 million. Certain objecting parties have appealed the district court's ruling and that appeal is pending before the Third Circuit. If the court approvals for the BSA's plan of reorganization are not affirmed on appeal, it is possible that adverse outcomes, if any, could have a material adverse effect on the Company's operating results.

In addition to the matter discussed above, the Company is or may become involved in claims litigation arising in the ordinary course of business, both as a liability insurer defending third-party claims brought against insureds and as an insurer defending coverage claims brought against it. The Company accounts for such activity through the establishment of unpaid loss and loss adjustment expense reserves. Subject to the uncertainties discussed in Note 1.C.11 regarding Asbestos/Environmental reserves, management expects that the ultimate liability, if any, with respect to such ordinary-course claims litigation, after consideration of provisions made for potential losses and costs of defense, will not be material to the financial condition of the Company. The Company is or may become involved in various other legal actions, some of which assert claims for substantial amounts. Management expects that the ultimate liability, if any, with respect to such lawsuits, after consideration of provisions made for estimated losses and costs of defense, will not be material to the financial condition of the Company.

18.    Defendant St. Paul Fire & Marine Insurance Company ("St. Paul") is a Connecticut corporation with its principal place of business in either Connecticut or Minnesota.

19.    Upon information and belief, St. Paul operates as a subsidiary of The Travelers Insurance Companies ("Travelers"), which is a major group of insurance companies.

20.    In its most recent Annual Report, Travelers described its claim function and philosophy as follows:

In our Claim organization, a proprietary large language model digests legal complaints filed against our insureds and then highlights key liability and coverage issues, assists in routing the cases to the best suited defense counsel, and provides risk-related insights that can be incorporated into our underwriting process.

As the power of this technology grows, our deployments will become even more sophisticated. We are currently piloting a Travelers claim knowledge assistant, a generative AI tool trained on many thousands of pages of proprietary technical source material, previously only accessible through thousands of different documents. The model provides Travelers Claim professionals with the ability to easily access accurate, actionable information on technical and procedural claim matters, increasing speed, accuracy and consistency in various workflows, including in interactions with our customers and distribution partners.

21.    Travelers further describes its insurance claim servicing practices as follows:

Claims Services uses technology, management information and data analysis to assist the Company in reviewing its claim practices and results in order to evaluate and improve its claims management performance. The Company's claims-management strategy is focused on segmentation of claims and appropriate technical specialization to drive effective claim resolution. The Company regularly monitors its investment in claim resources to maintain an effective focus on claim outcomes and a disciplined approach to continual improvement. The Company operates a state-of-the-art claims-training facility which offers hands-on experiential learning to help ensure that its claim professionals are properly trained. In recent years, the Company has invested significant additional resources in many of its claims handling operations, including digital, analytics, artificial intelligence and automation capabilities. The Company regularly monitors the effect of these investments to ensure a consistent optimization among outcomes, cost and service.

22. Defendant National Union Insurance Company of Pittsburgh, PA ("National Union") is a Pennsylvania corporation with its principal place of business in New York.

23. National Union is a subsidiary of American International Group, Inc. ("AIG").

24. In a recent financial statement, AIG described itself as a "leading global insurance organization [that] provides insurance solutions that help businesses and individuals in approximately 190 countries and jurisdictions protect their assets and manage risks through AIG operations and network partners."

25. John Does 1-50 are not-yet-identified insurance companies that sold liability insurance policies to the Diocese and that are contractually obligated to provide the Diocese with coverage for the underlying claims.

26. All of the Defendant Insurance Companies have sold liability insurance policies within the State of New Jersey for substantial premiums, including those sold to the Diocese.

### III.    Jurisdiction and Venue

27. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332, in that (A) there is complete diversity of citizenship between the Diocese and the

Insurance Company Defendants; and (B) the amount in controversy exceeds $75,000, exclusive of interest and costs.

28. An actual controversy exists between the Parties within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant declaratory relief.

29. Venue in this District is proper under 28 U.S.C. § 1391(b) because (A) the Defendant Insurance Companies have conducted substantial business in New Jersey, and (B) a substantial part of the events and omissions giving rise to the claims alleged in this case occurred in this District.

## IV.    The Terms and Conditions of the Insurance Policies

### A.  The St. Paul Policies

30. St. Paul sold the following policies of excess liability insurance to the Diocese (the "St. Paul Policies"):

| St. Paul Policy Number | Policy Period | Policy Limits |
|---|---|---|
| 566XD3300 | 12/3/78 – 12/3/79 | $10 million per occurrence and $10 million aggregate, excess of a self-insured retention in the amount of $150,000 per occurrence and $450,000 aggregate |
| 566XD3290 | 12/3/79 – 12/3/80 | Same limit structure as 1978-79 Policy |
| 566XD3296 | 12/3/80 – 12/3/81 | Same limit structure as 1978-79 Policy |
| 566XD3403 | 12/3/81 – 12/3/82 | Same limit structure as 1978-79 Policy |

31. The St. Paul Policies provide coverage for "Ultimate Net Loss," which is defined as follows:

8

The term 'Ultimate Net Loss' shall mean the total sum which the Insured, or any company as the Insurer or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, but shall exclude premiums on attachment or appeal bonds, and all expenses and costs for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder.

In the event expense in connection with any claim or suit is incurred jointly by mutual consent of the Company and of the Insured, the Company, in addition to its limits of liability as expressed in Item 4 of the Declarations shall be liable for no greater proportion of such expense and/or costs than the amount payable by the Company under this Policy bears to the total loss payment.

32.   With respect to the defense of claims made against the Diocese, the St. Paul Policies each state as follows:

The Insured shall be responsible for the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured.

The Insured shall use due diligence and prudence to settle all such claims and suits which in the exercise of sound judgment should be settled, provided, however, that the Insured shall make no settlement for any sum in excess of the retained limit without the approval of the Company.

When in the judgment of the Company an occurrence may involve damages in excess of the retained limit, the Company may elect at any time to assume complete control of the Investigation, settlement and defense of all claims and suits in connection therewith.

### B.  **The National Union Policies**

33.   National Union sold the following policies of comprehensive general liability insurance to the Diocese (the "National Union CGL Policies"):

| National Union CGL Policy Number | Policy Period | Policy Limits |
| --- | --- | --- |
| 956-73-64 | August 3, 1982 – August 3, 1983 | Coverage applies excess of $250,000 per occurrence self-insured retention; SIR |

| | | aggregate is $750,000; before SIR aggregate is exhausted, policy provides limit of $750,000 per occurrence; after SIR aggregate is exhausted, policy provides limit of $1 million per occurrence and aggregate |
|---|---|---|
| 918-53-57 | August 3, 1983 – August 3, 1984 | Same limit structure as 1982-1983 CGL Policy |
| 117-23-44 | August 3, 1984 – August 3, 1985 | Same limit structure as 1982-1983 CGL Policy |
| 117-05-82 | August 3, 1985 – August 3, 1986 | Same limit structure as 1982-1983 CGL Policy |

34. Each of the National Union CGL Policies provides coverage for, among other things, "bodily injury…to which this insurance applies, caused by an occurrence."

35. Each of the National Union CGL Policies states that National Union "shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury…even if any allegations of the suit are groundless, false or fraudulent."

36. Each of the National Union CGL Policies defines "occurrence" to mean "an accident, including continuous or repeated exposure to conditions, which results in bodily injury…neither expected nor intended from the standpoint of the insured."

37. Each of the National Union CGL Policies defines "bodily injury" to mean "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."

38. National Union sold the following policies of umbrella liability insurance to the Diocese (the "National Union Umbrella Policies"):

| National Union Umbrella Policy Number | Policy Period | Policy Limits |
|---|---|---|
| 133-22-80 | August 3, 1982 – August 3, 1983 | $9 million any one occurrence and in the aggregate excess of underlying insurance, or excess of a $10,000 "ultimate net loss" with respect to each occurrence not covered by underlying or other insurance |
| 131-85-21 | August 3, 1983 – August 3, 1984 | Same limit structure as 1982-1983 National Union Umbrella Policy |
| 131-77-98 | August 3, 1984 – August 3, 1985 | Same limit structure as 1982-1983 National Union Umbrella Policy |
| 194-37-63 | August 3, 1985 – August 3, 1986 | Same limit structure as 1982-1983 National Union Umbrella Policy |

39. Each of the National Union Umbrella Policies provides coverage for "that portion of the ultimate net loss in excess of the retained limit as hereinafter defined, which the Insured shall become legally obligated to pay as damages for liability imposed upon the Insured by law, or liability assumed by the Insured under contract because of…personal injury…"

40. Each of the National Union Umbrella Policies defines "personal injury" to include "bodily injury, sickness, disease, including death anytime resulting therefrom, shock, fright, mental anguish and mental injury."

41. Each of the National Union Umbrella Policies defines "occurrence" as "an event, including continuous or repeated exposure to conditions, which results in Personal

Injury…during the policy period, neither expected nor intended from the standpoint of the Insured."

42. Each of the National Union Umbrella Policies defines "ultimate net loss" to mean "the total sum which the Insured, or any company as its insurer, or both become obligated to pay by reason of personal injury…either through adjudication or compromise, and shall also include hospital, medical, or funeral charges and all sums paid or payable as wages, compensation, fees, charges, Interest, expenses for doctors, nurses, investigators and other persons, and for settlement, adjustment, investigation and defense of claims and excluding only salaries of the Insured or of the underlying Insurer's permanent employees."

    **C.  The First State Policy**

43. First State sold the Diocese a policy of Umbrella Liability Insurance numbered 908681 with a policy period of December 3, 1977 to December 3, 1978 (the "First State Policy").

44. The First State Policy provides that First State will "indemnify the INSURED for ULTIMATE NET LOSS…in excess of RETAINED LIMIT…all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED under contract or agreement for damages or expenses, because of PERSONAL INJURY…"

45. The First State Policy further provides as follows:

With respect to any OCCURRENCE not covered, as warranted by the underlying policies listed in Schedule A hereof, whether collectible or not. or not covered by any other underlying insurance collectible by the INSURED, but covered by the terms and conditions of this policy, except for the RETAINED LIMIT stated in Item 3 I B of the Declarations, the Company shall: defend any suit against the insured alleging PERSONAL INJURY, PROPERTY DAMAGE or ADVERTISING INJURY or DAMAGE and seeking damages therefore, even if such suit is groundless, false or

fraudulent; but the COMPANY may make such investigation, negotiation or settlement of any claim or suit as it deems expedient. The INSURED shall promptly reimburse the COMPANY for any amount paid in the satisfaction of cases defended hereunder within the retained limit after making proper deduction for all recoveries and salvage collectible, but excluding all loss expense and legal expense.

46. The First State Policy defines "occurrence" in relevant part as follows:

With respect to [coverage for bodily injury] "OCCURRENCE" shall mean an accident or event including continuous repeated exposure to conditions, which results. during the policy period, in PERSONAL INJURY…neither expected nor intended from the standpoint of the INSURED. For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one OCCURRENCE.

47. The First State Policy defines "personal injury" to include "bodily injury, sickness.

disease, disability or shock, including death at any time resulting therefrom, mental

anguish and mental injury."

48. The First State Policy defines "ultimate net loss" as follows:

[Ultimate net loss] means the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the INSURED is legally liable after making deductions for all other recoveries. salvages and other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy and also includes investigation, adjustment, appraisal, appeal and defense costs paid or incurred by the INSURED with respect to damages covered hereunder. 'ULTIMATE NET LOSS' does not include (a) costs and expenses which an underlying insurer has paid or incurred or is obligated to pay to or on behalf of the INSURED. (b) office costs and expenses of the INSURED and salaries and expenses of employees of the INSURED or (c) general retainer fees of counsel retained by the INSURED.

49. The First State Policy states that it applies to "ultimate net loss" in excess of the greater

of (A) an amount equal to the limits of liability indicated beside the underlying insurance

listed in the Schedule A of underlying insurance [$1,000,000], plus the applicable limits

of any other underlying insurance collectible by the insured; or (B) the retained limit of

$10,000 in ultimate net loss "as the result of any one occurrence not covered by…underlying insurance."

50. Upon information and belief, the primary insurance policy below the First State Policy was sold to the Diocese by Midland Insurance Company ("Midland"), which was placed into liquidation by the Supreme Court of the State of New York in 1986. The bar date for claims under policies sold by Midland was January 31, 2012.

51. As of the date of this Complaint, the Diocese has been unable to locate a copy of the policy sold to the Diocese by Midland.

52. With respect to CVA Claims that alleged abuse during the policy year December 3, 1977 to December 3, 1978 and that were reasonably settled by the Diocese, the Diocese's records show that more than $1 million in settlement payments have been made by the Diocese without reimbursement by insurance. As a result, an amount equal to the $1 million underlying indemnity limit has been paid, and the limit underlying under the First State Policy is deemed exhausted, triggering the First State Policy.

### D. The John Doe Insurance Policies

53. Upon information and belief, each of the John Doe Insurance Companies sold liability insurance policies to the Diocese containing terms and conditions similar or identical to the terms and conditions of the policies sold by one or more of the other Defendant Insurance Companies.

54. Upon information and belief, each of the John Doe Insurance Policies provides coverage for "bodily injury" caused by an "occurrence" and sustained during the policy period of such Policy.

**V.**     <u>**Nature and Background of the Underlying Litigation**</u>

55.    As a result of the "revival" provisions of the CVA, hundreds of lawsuits and claims have been filed or made against the Diocese by claimants in several New Jersey Counties, alleging that plaintiffs were sexually abused by priests, bishops, deacons, or other Church-affiliated individuals (the "CVA Claims").

56.    The CVA Claims allege, among other things, that the Diocese negligently hired and supervised the persons who committed the abuse.

57.    The Diocese has duly notified the Defendant Insurance Companies of the CVA Claims, and has complied with all applicable conditions precedent to coverage under the relevant insurance policies. To the extent that the Diocese did not comply with any such condition, such compliance is excused as futile given the Defendant Insurance Companies' subsequent treatment of the claims.

58.    As an example of the allegations made against the Diocese with respect to negligence, in *John Doe (JB) v. The Diocese of Trenton a/k/a The Roman Catholic Diocese of Trenton, a New Jersey not-for-profit corporation,* Docket No. MID-L-002623-21 (Superior Court of New Jersey, Middlesex County) ("JB Lawsuit"), the underlying plaintiff makes the following allegations against the Diocese:

Defendants [including the Diocese] negligently deemed that [Father Lucien Donnelly. OSB, an alleged abuser] was fit to work with children and/or that any previous problems were fixed or cured and/or that Donnelly would not sexually assault children and/or that Donnelly would not injure children.

Defendants [including the Diocese] knew or should have known that they had numerous agents who had sexually molested children and that child molesters have a high rate of recidivism.

Defendants [including the Diocese] negligently deemed that Donnelly was fit to work with children and/or that any previous problems were fixed or cured and/or that Donnelly would not sexually assault children and/or that Donnelly would not injure children.

As a result of Defendants' [including the Diocese] negligence as described herein, Plaintiff has suffered, and will continue to suffer, great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, physical, personal and psychological injuries.

The Defendants [including the Diocese] are vicariously liable for Donnelly's sexual abuse of Plaintiff because Fr. Donnelly was actually, ostensibly, or apparently acting in the course and scope of his role as a priest with the Defendants and there was reliance upon his position with the Defendants by Plaintiff and his family.  This reliance facilitated the abuse.  Moreover, Fr. Donnelly was aided in the commission of the abuse by his position as a priest and assignments directed by Defendants.

Defendants [including the Diocese] breached their duties to Plaintiff by failing to use reasonable care. Defendants' failures include, but are not limited to, failing to properly supervise Donnelly, failing to properly supervise Plaintiff, and failing to protect Plaintiff from a known danger.

Defendants [including the Diocese] were negligent in the training, supervision, and instruction of its employees. Defendants failed to timely and properly educate, train, supervise, and/or monitor its agents or employees with regard to policies and procedures that should be followed when sexual abuse of a child is suspected or observed, including the duty to notify law enforcement or other proper authorities of alleged, suspected, or observed sexual abuse of a minor children/minor children.

Defendants [including the Diocese] were additionally negligent in failing to supervise, monitor, chaperone, and/or investigate Donnelly and/or in failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to prevent Donnelly's sexual abuse of Plaintiff.

Defendants [including the Diocese] negligently retained Donnelly with knowledge of Donnelly's propensity for the type of behavior that resulted in Plaintiff's injuries in this action.

59. The allegations made in the JB Lawsuit with respect to the alleged negligence of the

Diocese are typical of the allegations made against the Diocese in all of the CVA Claims,

although the alleged abuser and the time periods of the abuse differ. Upon information and belief, all or virtually all of the Underlying Claimants use similar language to allege that the Diocese engaged in negligence, negligent hiring, and negligent supervision.

60.    In short, each of the CVA Claims is asserted under the reviver provisions of the CVA. Each of the claimants in these matters has asserted a claim or commenced a suit against the Diocese and others. Each Claimant alleges that as a minor he or she was sexually abused by a person who was negligently supervised by the Diocese and its associated parishes.

## VI.    The Defendant Insurance Companies' Responses to the Claims.

61.    With respect to notices of the CVA Claims provided to the Defendant Insurance Companies, one of the following circumstances is true for each such Claim:

a.    The Diocese duly provided the Defendant Insurance Companies with notice of the claim and reasonable supporting documentation.

b.    To the extent that the Defendant Insurance Companies contend that such notice was not timely provided, there has been no appreciable prejudice to the Defendant Insurance Companies. None of the Defendant Insurance Companies has identified anything that it would have done differently if provided with earlier notice.

62.    To date, First State has not provided the Diocese with a definitive coverage position as to the CVA Claims that implicate its policy year.

63.    The St. Paul Policies do not obligate St. Paul to defend the Diocese in the CVA Claims. A dispute exists, however, as to whether the self-insured retentions beneath the St. Paul Policies have been exhausted by payment of settlements to certain underlying plaintiffs,

which would trigger indemnity coverage for further settlements that implicate the St. Paul policy years.

64. The lack of resolution with respect to the self-insured retentions under the St. Paul Policies is hampering ongoing settlement discussions with certain underlying claimants.

65. St. Paul has also disputed the applicable trigger of coverage under its policies, arguing that the "continuous trigger" rule that is the general rule for occurrence-based coverage in New Jersey does not apply to the CVA Claims.

66. St. Paul has also disputed whether the Diocese has properly tendered claims to St. Paul.

67. National Union's response to the notices of claim provided by the Diocese has been as follows:

   a. With respect to a small number of the CVA Claims that implicate its coverage, National Union has offered to provide the Diocese with a defense under a reservation of rights. The vast majority of CVA Claims that trigger the National Union Policies, however, have either been ignored or not covered.

   b. National Union has disputed coverage on numerous grounds, including the interpretation of the relevant self-insured retentions. National Union contends that the self-insured retentions should be repeatedly duplicated, ensuring that its coverage will be difficult to reach, or will never be reached. National Union has argued, for example, as follows: "[C]overage under the [National Union CGL] Policies applies only upon the exhaustion or satisfaction of a $250,000 per-occurrence self-insured retention ('SIR') applicable to each policy. The Diocese must exhaust or satisfy at least one SIR for each and every injury-causing 'occurrence,' per policy period in which Plaintiff was allegedly abused, and,

potentially, for each location of alleged abuse, before National Union has any obligation to pay defense or indemnity costs under the [National Union CGL] Policies. To date, there is no indication that all applicable SIRs have been properly exhausted. As such, the [National Union CGL] Policies are not implicated… at this time…"

    c.   National Union contends that if an incident of abuse (as opposed to ongoing harm caused by that incident) took place outside National Union's policy periods, there is no coverage.

    d.   National Union contends that the Diocese did not properly notify National Union of settlements within the self-insured retention and therefore forfeited its coverage.

68.    With the assistance of its insurance consultant (Willis Towers Watson), the Diocese has engaged in discussions and communications with St. Paul and National Union for over two years in an effort to construct a cost-sharing allocation model to deal in a reasonable way with the CVA Claims, and to ensure that Underlying Claimants with valid claims receive fair compensation. The Diocese has sought to avoid the expense of insurance coverage litigation with the Defendant Insurance Companies, due to a belief that funds needlessly spent in insurance coverage litigation could be more productively used in fairly compensating victims.

69.    The First State Policy was discovered in 2024. In the months since the Diocese placed First State on notice of the CVA Claims, Willis Towers Watson has engaged in discussions with First State in an effort to construct a reasonable and economical method to deal with the CVA Claims, to no avail. First State still has not taken a formal coverage position.

70.   At this juncture, it is evident that a dispute exists among the parties, and that judicial intervention is necessary to construct and enforce a reasonable and cost-effective method for processing the CVA Claims, and to ensure that victims with valid claims receive fair compensation.

## First Count

### (Declaratory Judgment with Respect to Defense)

71.   The Diocese repeats the previous allegations of this Complaint.

72.   With respect to First State, National Union, and potentially the John Doe Insurance Companies, an actual and justiciable controversy exists among the parties as to responsibility for defending the CVA Claims, requiring judicial intervention.

WHEREFORE, the Diocese demands judgment on this First Count against First State, National Union, and the John Doe Insurance Companies as follows:

A.   Declaring and adjudging that First State, National Union, and the John Doe Insurance Companies are responsible for defending the Diocese and its associated parishes, and paying the costs of defense of the Diocese and its associated parishes, with respect to any and all CVA Claims alleging that "bodily injury," as defined by their respective policies or by applicable law, took place during their respective policy periods in whole or in part due to alleged negligence, negligent hiring, or negligent supervision by the Diocese.

B.   Awarding the Diocese compensatory damages incurred as the result of the failure of First State, National Union, and the John Doe Insurance Companies (1) to defend the Diocese with respect to the CVA Claims and (2) to implement a reasonable procedure for the allocation of costs with respect to such Claims.

C.   Awarding the Diocese interest and costs of suit.

D.   Awarding the Diocese its attorneys' fees and legal costs incurred in prosecuting this insurance coverage lawsuit to the extent permitted by law.

E.   Awarding the Diocese such other relief as the Court may deem appropriate.

## Second Count

### (Against St. Paul and National Union for Declaratory Judgment with Respect to Self-Insured Retentions)

73.   The Diocese repeats the previous allegations of this Complaint.

74.   With respect to St. Paul and National Union, an actual and justiciable controversy exists as to the proper interpretation and application of self-insured retentions under their respective Policies, requiring judicial intervention.

75.   Specifically, St. Paul and National Union contend that self-insured retentions have not been satisfied with respect to a considerable number of the CVA Claims despite Willis Towers Watson presenting them with evidence of exhaustion of such retentions.

76.   National Union, in particular, has taken the position that multiple self-insured retentions need to be satisfied with respect to each CVA Claim, based upon each individual incident of abuse committed by a single transgressor upon a single victim, and also based upon each location where abuse may have taken place. St. Paul, conversely, has taken the position that there is only a single "occurrence" with respect to each claimant, which St. Paul has described as an alleged "decision to adopt an overall institutional policy of tolerating and covering up sex abuse, and that the Diocese is thus entitled to only one 'per occurrence' limit in each policy year."

77.    The lack of clarity as to what constitutes the relevant "occurrence" or "occurrences" under the St. Paul and National Union Policies has made it difficult if not impossible for the Diocese to engage in settlement discussions with the Underlying Claimants. This is an ongoing and immediate problem that requires the Court's intervention.

WHEREFORE, the Diocese demands judgment on this Second Count against St. Paul and National Union as follows:

A.    Declaring and adjudging the proper method of determining whether self-insured retentions under the St. Paul and National Union Policies have been satisfied with respect to each CVA Claim as to which the St. Paul and National Union Policies are potentially triggered.

B.    Awarding the Diocese all relevant compensatory damages.

C.    Awarding the Diocese interest and costs of suit.

D.    Awarding the Diocese its attorneys' fees and legal costs incurred in prosecuting this insurance coverage lawsuit to the extent permitted by law.

E.    Awarding the Diocese such other relief as the Court may deem appropriate.

### **Third Count**

### **(Against First State for Declaratory Judgment with Respect to Exhaustion of Underlying Limits)**

78.    The Diocese repeats the previous allegations of this Complaint.

79.    With respect to First State, an actual and justiciable controversy exists as to whether the $1 million indemnity limit underlying its Policy either has been exhausted, or is certain to be exhausted, requiring judicial intervention.

80.   Specifically, First State contends that the available evidence is insufficient to support a conclusion that the $1 million indemnity limit underlying its Policy  has been exhausted, while the Diocese contends that its accounting records and records of settlements paid demonstrate conclusively that an amount equal to the $1 million underlying limit either has been exhausted, or is virtually certain to be exhausted, by the payment of reasonable settlements to CVA claimants who have alleged abuse during First State's policy year.

81.   To the extent that First State contends that it received late notice of claim or of the settlement of claims alleging abuse during its policy year, First State as an umbrella insurer has suffered no appreciable prejudice, and has articulated none to the Diocese.

WHEREFORE, the Diocese demands judgment on this Third Count against First State as follows:

A.  Declaring and adjudging that the liability limits underlying the First State Policy have been exhausted, and that coverage under the First State Policy has been triggered.

B.  Awarding the Diocese compensatory damages.

C.  Awarding the Diocese interest and costs of suit.

D.  Awarding the Diocese its attorneys' fees and legal costs incurred in prosecuting this insurance coverage lawsuit to the extent permitted by law.

E.  Awarding the Diocese such other relief as the Court may deem appropriate.

## Fourth Count

### (Breach of Contract)

82.   The Diocese repeats the previous allegations of this Complaint.

83.   To the extent that the Diocese has incurred unreimbursed defense costs or other expenses as the result of the failure and refusal of First State and National Union to agree upon

and implement a fair and reasonable method for the allocation of claims under their respective Policies, such Defendant Insurance Companies have breached their contracts with the Diocese, as the result of which the Diocese has been damaged.

WHEREFORE,  the Diocese demands judgment on this Fourth Count against First State and National Union as follows:

    A.  Awarding the Diocese its compensatory damages.

    B.  Awarding the Diocese interest and costs of suit.

    C.  Awarding the Diocese its attorneys' fees incurred in prosecuting this insurance coverage case to the extent permitted by law.

    D.  Awarding such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

The Diocese demands trial by jury as to all issues in this case so triable as of right.

Dated:  September 16, 2025

                                                **THE KILLIAN FIRM, P.C.**
                                                *Attorneys for Plaintiff*
                                                /s/ Eugene Killian, Jr.

## **<u>RULE 11.2 DECLARATION</u>**

EUGENE KILLIAN, JR., of full age, declares as follows:

1. I have been a member in good standing of the Bar of the State of New Jersey and of the bar of this Court since 1990. I am the Principal Member of The Killian Firm, P. C., the attorneys for plaintiff in this action.

2. To the best of my knowledge, information and belief, the matter in controversy is not the subject of any other action pending in any Court, or of any pending arbitration or administrative proceeding.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 16, 2025.

/s/ Eugene Killian, Jr.